**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ST. MARY'S HOSPITAL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 06-2083 (GK) |
| | ) | ECF |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF FILING OF ADMINISTRATIVE RECORD

Defendant, Secretary of Health and Human Services, United States Department of Health and Human Services, hereby files the attached administrative record in the above-captioned action.

Respectfully submitted,


    /s/    Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


    /s/    Megan L. Rose
MEGAN L. ROSE, NC Bar # 28639
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7220
(202) 514-8780 (fax)
Megan.Rose@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
ST. MARY'S HOSPITAL
V.
MICHAEL O. LEAVITT

1:06CV02083  (GK)
ADMINISTRATIVE RECORD
1 OF 1

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ST. MARY'S HOSPITAL,                )
                                    )
                Plaintiff,          )
                                    )
                                    )
        vs.                         )  Case No. 1:06CV02083
                                    )
                                    )
MICHAEL O. LEAVITT, SECRETARY       )
DEPARTMENT OF HEALTH AND            )
HUMAN SERVICES,                     )
                                    )
                Defendant.          )


## C E R T I F I C A T I O N

I, Jacqueline R. Vaughn, Attorney Advisor, Centers for Medicare and Medicaid Services, Department of Health and Human Services, under authority delegated by the Secretary, certify that the documents attached constitute a true and accurate transcript of the official file as furnished by the Provider Reimbursement Review Board (PRRB). These documents are the record of the PRRB's proceedings and denial concerning the Provider's request for reinstatement of its appeal for fiscal year ending September 30, 1995 under Title XVIII of the Social Security Act, as amended.


Date: March 15, 2007

Jacqueline R. Vaughn

St. Mary's Hospital
PRRB Case No. 06-1828

## COURT TRANSCRIPTS INDEX

| | Page No(s) |
|---|---|
| PRRB's Notice, dated February 16, 2007, denial of Provider's Request for Reinstatement | 1-3 |
| Provider's Position Paper with Exhibits | 4-24 |
| Provider's Motion to Reinstate with Exhibits | 25-41 |
| Correspondence regarding Intermediary's Position Paper | 42-43 |
| PRRB's Notice, dated October 19, 2006, Dismissal and Closure of the Case | 44 |
| PRRB's Notice, dated June 15, 2006, Acknowledgement and Critical Due Dates | 45-46 |
| Provider's Letter, dated June 2, 2006, regarding Request for Medicare Appeal for FYE September 30, 1995 | 47-55 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to:

CERTIFIED MAIL

FEB 1 6 2007

Saint Mary's Hospital
Dan DeBarba
Chief Financial Officer
56 Franklin Street
Waterbury, CT 06706

RE: St. Mary's Hospital, Provider No. 07-0016, FYE 09/30/1995, Case No. 06-1828

Dear Mr. DeBarba:

The Provider Reimbursement Review Board (the Board) is in receipt of the Provider's Motion to Reinstate and Final Position Paper which was submitted to the Board on December 13, 2006. The pertinent facts of the case and the Board's determination are set forth below.

Pertinent Facts:

The Provider filed its appeal request on June 2, 2006 based on an NPR that was issued on December 6, 2005.

The Board acknowledged the case on June 15, 2006. The preliminary position paper due date was set for October 1, 2006.

On October 19, 2006 the Board dismissed the appeal because the preliminary position paper was not filed.

On November 29, 2006 the Intermediary submitted its preliminary position paper, even though the case was closed at that point.

On December 13, 2006, the Provider requested reinstatement of the appeal and supplied the final position paper. The Provider argues that, due to a miscommunication between the Provider and its reimbursement consultant (who was not the authorized representative before the Board), the preliminary position paper due date was missed. The Provider also argues that the initial appeal contained a detailed list of the issues, the adjustments in dispute, the factual background, the Provider's position on the issues, citations to regulations and manuals and reimbursement impacts. Finally, the Provider contends that the lateness of the preliminary position paper does not interfere with final position paper deadlines or the tentative hearing date.

**1**

Page 2 of 3
Case No. 06-1828

<u>Board Determination:</u>

The statute 42 U.S.C. 1395oo(e) provides that the Board has full power and authority to make rules and establish procedures, not inconsistent with the provisions of this title or the regulations of the Secretary of the Department of Health and Human Services, which are necessary or appropriate to carry out the provision of this section. Board procedures provide an orderly working structure to the appeals process as well as serving to provide notice to the parties of the process to be followed and the dates upon which the parties are expected to exchange or submit appropriate information and/or documentation. The procedures of the Board also serve to provide details on the required method for accomplishing the task and notice of the various stages to be followed by the parties. Control over the internal hearing process is left to the discretion of the Board.

The Provider in this case made one filing consisting of its request for a Board hearing and supporting evidence (NPR and audit adjustment page). Consequently, its appeal was dismissed when the preliminary position paper due date was missed.

In its reinstatement request, one of the arguments the Provider presents is that it satisfied the requirements for a preliminary position paper by submitting a detailed and specific request for hearing. The Board however disagrees with this argument. Pursuant to 42 C.F.R. §405.1841(a)(1) and 42 C.F.R. § 405.1853(a), the Provider is required to file separately its request for a Board hearing and its subsequent position paper. The language in these provisions does not mention any Provider right to consolidate these two distinct paper filings at the beginning of the appeal process. It is within the Board's discretion and authority to determine what dates are acceptable and binding upon the Parties for filing a position paper.

Further, the Board majority notes that the Provider did not furnish any documentary evidence in the initial appeal request to support its position. The initial filing and the recently filed position paper do not give sufficient detail to identify the particular days at issue nor does it provide a rationale for the Provider's position. In fact, the position paper contains a conclusive statement only.

Page 3 of 3
Case No. 06-1828

Position papers are developed so that they may assist the Board in its deliberations. Position papers serve as a valuable information exchange throughout the hearing process. They serve as a base document providing the Parties the opportunity to negotiate and/or settle outstanding issues. This process would be rendered meaningless if the Provider were able to ignore current Board procedure by filing position papers with its request for a hearing. The position paper process is intended to get the Parties talking and resolving their disagreements between the time of filing the appeal and the date of the Board hearing.

Based on the facts of this case, the Board majority hereby denies the Provider's request for reinstatement.

Board Members Participating:                    For the Board:
Gary B. Blodgett, DDS (dissenting)
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes (dissenting)                    Suzanne Cochran, Esq.
Suzanne Cochran, Esq.                           Chairperson

cc: George Porette, Empire Medicare Services
    Wilson C. Leong, Blue Cross Blue Shield Association

3

**Saint Mary's**
HOSPITAL
Your Regional Health Care Center

RECEIVED
DEC 18 2006
PROVIDER REIMBURSEMENT
REVIEW BOARD

<u>**CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED**</u>

December 13, 2006

Ms. Suzanne Cochran, Esq.
Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re:    **Provider Name**     :    **Saint Mary's Hospital**
       **Provider Number**    :    **07-0016**
       **PRRB Case Number** :   06-1688- 182 8
       **Fiscal Year Ended**  :    **September 30, 1995**
       **Final Position Paper**

Dear Ms. Cochran:

Enclosed please find a copy of the Provider's position paper and a Motion to Reinstate the above referenced appeal.

If you have any questions, please feel free to contact me at (203) 709-5871.

Sincerely,

Dan DeBarba
Chief Financial Officer

cc:    Ms. Celeste Roberts, Manager, Audit & Reimbursement, Empire Medicare Services, P.O. Box 4846, Syracuse, NY 13221-4846 (w/encl.)

       Mr. Wilson C. Leong, Director, BCBSA, 225 N. Michigan Avenue, Chicago, Il. 60601 (w/o encl.)

Enclosures

56 Franklin Street
Waterbury, Connecticut 06706
(203) 574-6000

*An Affiliated Hospital of Yale University School of Medicine*

4

# FINAL POSITION PAPER

For Submission to

## PROVIDER REIMBURSEMENT REVIEW BOARD
## BALTIMORE, MARYLAND

RECEIVED
DEC. 16 2006
PROVIDER REIMBURSEMENT
REVIEW BOARD

|  |  |  |
|---|---|---|
| **PROVIDERS** | ) | |
| | ) | |
| | ) | |
| SAINT MARY'S HOSPITAL | ) | |
| Provider No: 07-0016 | ) | |
| FYE:  09/30/1995 | ) | |
| | ) | |
| vs. | ) | PRRB Case No. 06-1828 |
| | ) | |
| **INTERMEDIARY** | ) | |
| | ) | |
| Empire Medicare Services | ) | |
| Provider Audit & Reimbursement | ) | |

Submitted By

SAINT MARY'S HOSPITAL
56 FRANKLIN STREET
WATERBURY, CT  06706
(860) 539-2472

# CONTENTS

                                                                    Page No.

Statement of Facts    ....    ....    ....    ....    ....    ....    ....    ....    ....    1

Introduction    ....    ....    ....    ....    ....    ....    ....    ....    ....    ....    2

Medicare Disproportionate Share Payment:

              Statement of Issue    ....    ....    ....    ....    ....    ....    ....    3
              Law, Regulations of Program Policy....    ....    ....    ....    ....    4
              Provider's Position    ....    ....    ....    ....    ....    ....    ....    5
              Conclusion    ....    ....    ....    ....    ....    ....    ....    ....    7

Index to Exhibits    ....    ....    ....    ....    ....    ....    ....    ...    ....    8

## STATEMENT OF FACTS

| | | |
|---|---|---|
| Provider Name | : | Saint Mary's Hospital |
| Provider Number | : | 07-0016 |
| Intermediary | : | Empire Medicare Services |
| Cost Reporting Period | : | 09/30/1995 |
| PRRB Case Number | : | 06-1828 |
| Date of NPR | : | 05/13/1997 |
| Date of Appeal | : | 06/02/2006 |
| Type of Control | : | Nonprofit |
| Type of Provider | : | General Short Term Hospital |
| Method of Reimbursement | : | Prospective Payment System |

Intermediary Adjustment(s) Appealed:

| Adjustment Name | Est. Medicare Reimb. Effect |
|---|---|
| Disproportionate Share | |
| Medicaid Proxy | $ 193,900 |

1

7

## INTRODUCTION

Saint Mary's Hospital (Provider) is a Medicare certified acute care hospital located in Waterbury, Connecticut. The Provider filed a timely appeal with the Provider Reimbursement Review Board and was assigned case number 06-1828. The Intermediary excluded approximately $193,900 in settling their cost reports.

The adjustment amount $193,900 is largely attributable to the Intermediary's exclusion of Medicaid eligible days.

2

8

## STATEMENT OF ISSUE

Whether the Intermediary determined Medicare Reimbursement for Disproportionate Share Payments in accordance with the Medicare statute 42 U.S.C. Section 1395ww(d) (5) (F) (vi) (II)? The amount in controversy is $193,900.

The Federal Appellate Courts for the Fourth, Sixth, Eighth and Ninth Circuits and the U.S. District Court in the Northern District of Texas held that in determining the Medicaid proxy used to calculate Medicare DSH payment, the Secretary was required to count all patient days attributable to patients who were eligible for medical assistance under a state Medicaid plan regardless of whether the days were actually paid by the state plan.  To ensure national uniformity in the calculation of the DSH adjustment, HCFA issued Ruling No.97-2 accepting the decisions of the Federal Appellate Courts.

The Intermediary has not complied with the abovementioned Circuit Court of Appeals and the U.S. District Court in the Northern District of Texas decisions and HCFAR Ruling 97-2.

3

**9**

## LAW, REGULATIONS AND PROGRAM POLICY

| | | |
|---|---|---|
| Law | : | Social Security Act |
| | | Section 1886(d)(5)(F) |
| | | |
| Regulations | : | 42 C.F.R., Part 412, Subpart H |
| | | Section 412.106 |
| | | |
| Program Policy | : | Federal Register |
| | | Vol. 51, No. 87/Tuesday, May 6, 1986 |
| | | Vol. 51, No. 170/Wednesday, September 3, 1986 |
| | | HCFAR Ruling 97-2 dated February 27, 1997 |

10

## PROVIDER'S POSITION

The Provider contend that the Intermediary's determination for Medicare Reimbursement for Disproportionate Share Payments was not in accordance with the Medicare statute 42 U.S.C. § 1395ww(d) (5) (F) (v) (II). The amount at issue is $193,900.

**Calculation of Medicaid Days**

The Federal Appellate Court for the United States Eastern District of Missouri (in <u>Deaconess Medical Center vs. Donna E. Shalala, Secretary of Health & Human Services</u>) affirmed the Provider position that all Medicaid eligible days should be included in the calculation of the Medicare Disproportionate Share Adjustment. Similar decisions were rendered by the Federal Sixth Circuit Court of Appeals (in <u>Jewish Hospital vs. Shalala</u>) and in the Federal Ninth Circuit Court of Appeals and U.S. District Court, Northern District of Texas (in <u>Legacy Emanuel Hospital v. Shalala and Incarnate Word Health Services Fort Worth Healthcare Corporation v. Shalala</u>).

As a result of the above Federal Court decisions, HCFA/CMS issued HCFAR 97-2, which in pertinent part read as follows:

"........ the Medicare disproportionate share adjustment under the hospital inpatient prospective payment system will be calculated to include all inpatient hospital days of service for patients who were eligible on that day for medical assistance under a state Medicaid plan in the Medicaid fraction, whether or not the hospital received payment for these inpatient hospital

5

services."

The Provider therefore concludes that the Medicaid eligible days should be included in the Medicaid Proxy as per HCFA instructions and the pertinent Federal Court decisions.

6

## CONCLUSION

The Provider requests the Intermediary to administratively resolve this issue by computing the Medicaid ratio using patient days applicable to all Medicaid eligible patients to comply with the decisions of the Federal Courts and HCFAR 97-2.

## EXHIBITS

Exhibit 1 : Eighth Circuit Court of Appeals Decision in Deaconess Health Services Corporation v. Shalala, Case No. 95-4126EM, dated May 22nd, 1996.

Exhibit 2 : U.S. District Court, Eastern District of Missouri, Eastern Division Decision in Deaconess Health Services Corporation v. Shalala, Case No. 4:93 CV 1594 DDN, dated October 16, 1995.

Exhibit 3 : Disproportionate Share Calculation for FYE September 30, 1995.

8

14





US-CT-APP-8, MED-GUIDE 1996-1 MED-GUIDE-TB ¶44,220, **Deaconess Health Services Corp. v. Shalala.**, U.S. Court of Appeals for the Eighth Circuit, (May 22, 1996)

**Deaconess Health Services Corp. v. Shalala.**

U.S. Court of Appeals for the Eighth Circuit, No. 95-4126EM, May 22, 1996

Before: McMILLIAN, FAGG, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

**Medicare and Medicaid: Disproportionate Share Hospitals**

**Missouri--Prospective payment systems--Special treatment of certain facilities--Disproportionate share hospital calculation.--**
A federal district court in Missouri properly determined that the Secretary incorrectly construed the Medicaid low-income proxy calculation used to determine disproportionate share hospital designation as counting only those patient days that actually were paid by state Medicaid plans. The language of the proxy was not ambiguous in directing the Secretary to count all patient days attributable to patients who were eligible for medical assistance under a state Medicaid plan regardless of whether the days actually were paid for by the state plan. The Secretary's construction, focusing on actual payment, conflicted with the statute's focus on patient eligibility. If an individual is eligible for medical assistance under both a state Medicaid plan and Medicare Part A, then all days on which services were received should be included in the proxy calculation regardless of whether all such days were paid by the state Medicaid plan.

See ¶4269.18, ¶14,725.13.
   **The opinion of the U.S. District Court, Eastern District of Missouri (1995-2 Transfer Binder ¶43,725 ) is affirmed.**

PER CURIAM: Donna E. Shalala, Secretary of Health and Human Services, appeals the adverse grant of summary judgment by the district court in favor of Deaconess Health Services Corporation. *Deaconess Health Servs. Corp. v. Shalala*, 912 F. Supp. 438 (E.D. Mo. 1995). Having carefully reviewed the record and the parties' briefs, we conclude summary judgment was properly granted. Our decision is guided by the Sixth Circuit's recent decision in *Jewish Hosp., Inc. v. Secretary of Health & Human Servs.*, 19 F.3d 270 (6th Cir. 1994). We thus affirm on the basis of the district court's thorough, well-reasoned opinion. *See* 8th Cir. R. 47B.

[¶44,221 --44,398]  Reserved.

Exhibit 2

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, **Deaconess Health Services Corp. v. Shalala.,** U.S. District Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)

**Deaconess Health Services Corp. v. Shalala.**

U.S. District Court, Eastern District of Missouri, Eastern Division, No. 4:93 CV 1594 DDN, Oct. 16, 1995

**Medicare and Medicaid: Disproportionate Share Hospitals**

**Prospective payment systems--Special treatment of certain facilities--Disproportionate share hospital calculation.--**
The Secretary incorrectly construed the Medicaid Low Income Proxy calculation used to determine disproportionate share hospital designation as counting only those patient days that actually were paid by state Medicaid plans. The language of the proxy was not ambiguous in directing the Secretary to count all patient days attributable to patients who were eligible for medical assistance under a state Medicaid plan regardless of whether the days were actually paid for by the state plan. The Secretary's construction, focusing on actual payment, conflicted with the statute's focus on patient eligibility. If a person is eligible for medical assistance under both a state Medicaid plan and Medicare Part A, then all days on which services were received should be included in the proxy calculation regardless of whether the state Medicaid plan paid for all such days.

See ¶4269.18, ¶14,725.13.
*MEMORANDUM*

This matter is before the Court upon the cross motions of the parties for summary judgment under Federal Rule of Civil Procedure 56. The parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge. 28 U.S.C. §636(c).

Plaintiff, Deaconess Health Services Corporation, is a not-for-profit hospital in St. Louis, Missouri, that participates in the Medicare and Medicaid programs. Plaintiff commenced this action on July 9, 1993, challenging the construction adopted by the defendant, the Secretary of the Department of Health and Human Services ("the Secretary"), of a Medicare statute directing the Secretary to make additional Medicare payments to hospitals, such as the plaintiff, that serve "a significantly disproportionate number of low-income patients." Specifically, plaintiff challenges the Secretary's regulatory interpretation of the disproportionate share payment adjustment for inpatient hospital services under the Medicare "Prospective Payment System" (PPS). 42 U.S.C. §1395ww(d)(5)(F); 42 C.F.R. §412.106(b) . Plaintiff seeks declaratory and injunctive relief and additional payment the hospital alleges it is owed under the Medicare statute..

Based on the record proffered by the parties, the undersigned finds the following facts undisputed:

*FACTS*

1. Congress enacted the Medicare program (Title XVIII of the Social Security Act) in 1965. Pub. L. No. 89-97, §102(a); 42 U.S.C. §§1395 *et seq.* Medicare is a health insurance program that pays for covered medical care primarily to qualifying aged and disabled persons. The Medicare program consists of two main parts. Part A ("Hospital Insurance Benefits") authorizes payment for primary institutional care, including hospital, skilled nursing facility, and home health care. 42 U.S.C. §§1395c-1395i-4. Part B ("Supplementary Medical Insurance Benefits") authorizes payment for physicians' and other non-hospital supplemental services. 42 U.S.C. §§1395j-1395w-4. This case involves Medicare payment for hospital services under Part A. Medicare Part A pays the costs of inpatient hospital services and related post-hospital services, and is funded by hospital insurance taxes. 42 U.S.C. §§1395c, 1395d, 1395i. Part A services are furnished by "providers of services," and a hospital may participate in the Medicare program as a provider by entering into a provider agreement with the Secretary. 42 U.S.C. §§1395x(u), 1395cc. Plaintiff is a hospital participating in the Medicare program.

2. Congress also enacted the Medicaid program (Title XIX of the Social Security Act) in 1965. Pub. L. No. 89-97, §121(a); 42 U.S.C. §§1396, *et seq.* Medicaid is a cooperative federal-state program that furnishes health care to indigent persons who are aged, blind, or disabled, or members of families with dependent children, who meet

specified eligibility requirements. 42 U.S.C. §1396, *et seq.* The program is jointly financed by the federal and state governments and is administered by the states. *Id.*; 42 C.F.R. §430.0 .

3. States that choose to participate in the Medicaid program must submit a "state plan" that fulfills the broad requirements imposed by the statute and regulations. 42 U.S.C. §1396a. Within those broad federal rules, each state determines the type and range of services that are covered, the rules for eligibility, and the payment levels for services. 42 C.F.R. §430.0 . The statute specifies the amount, duration, and scope of medical services which must be covered as well as those which may be covered at state option. *See* 42 U.S.C. §§1396a(a)(10), 1396d. All states must furnish certain minimum benefits, including "inpatient hospital services." *See* 42 U.S.C. §§1396a(a)(10)(A), 1396d(a)(1). The statute also specifies the groups of individuals who must be entitled as well as those who may be entitled at state option. *See* 42 U.S.C. §§1396a(a)(10). Under the Medicaid program, states must provide medical assistance to certain "categorically needy" persons, defined as those persons whose income is below a certain identified level and who are either aged, blind, or disabled, or members of families with dependent children. 42 U.S.C. §1396a(a)(10)(A). The statute also permits states, at their option, to provide medical assistance to other groups of "categorically needy" persons, and to certain "medically needy" individuals (individuals who would be categorically needy except for their slightly higher income and resources). *See* 42 U.S.C. §1396a(a)(10)(ii). Because of the considerable discretion left to states in formulating state plans, Medicaid programs vary greatly from state to state, both with regard to eligible persons (groups of persons covered) and covered services (benefits provided).

4. Among the benefits covered by Medicare are hospital services. For cost reporting years beginning before October 1, 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis. 42 U.S.C. §1395f(b). Effective with cost reporting periods beginning on or after October 1, 1983, Congress adopted a prospective payment system ("PPS") to reimburse most hospitals, including plaintiff, for operating costs of inpatient hospital services. 42 U.S.C. §1395ww(d). Under PPS, a hospital's actual costs do not determine the Medicare payment that the hospital will receive for its operating costs. Instead, Medicare payments are based upon predetermined nationally applicable rates set on a per-discharge basis. Hospitals are paid a fixed amount for each patient based on one of approximately 490 diagnosis-related groups, subject to certain payment adjustments. 42 U.S.C. §1395ww(d)(1)-(d)(4); 42 C.F.R. Part 412.

5. When Congress enacted Medicare PPS in 1983, it authorized the Secretary to provide an adjustment, called the disproportionate share adjustment, to PPS payments for hospitals that serve a disproportionate share of low income patients. 42 U.S.C. §1395ww(d)(5)(F). *See* Social Security Amendments of 1983, Pub. L. No. 98-21, §601(e), codified at 42 U.S.C. §1395ww(d)(5)(C)(i) (1983). This reflected Congressional judgment that low-income patients are usually in poorer health and cost more to treat than others. *Rye Psychiatric Hospital Center, Inc. v. Shalala*, 52 F.3d 1163, 1164 (2d.Cir. 1935), *cert. denied*, No. 95-110, 1995 WL 437230 (Oct. 10, 1995). The Secretary, however, declined to make such an adjustment. 48 Fed. Reg. 39,783 (1983). Congress then directed the Secretary, by December 31, 1984, to develop and publish a disproportionate share definition and identify hospitals that met that definition. Deficit Reduction Act of 1984, Pub. L. No. 98-369, §2315(h), codified at 42 U.S.C. §1395ww note. By July 1985, the Secretary had not yet complied with this congressional mandate, which resulted in a group of hospitals obtaining a court order directing the Secretary to implement the disproportionate share statutory provision. *See Samaritan Health Center v. Heckler*, 636 F. Supp. 503 (D.D.C. 1985). In 1986, after the Secretary issued disproportionate share criteria (50 Fed. Reg. 53,398-53,400 (1985)), Congress amended the Medicare statute to prescribe a statutory definition of disproportionate share hospitals. Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, §9105 (1986); *Samaritan Health Center v. Bowen*, 646 F. Supp. 343, 345-47 (D.D.C. 1986); 42 U.S.C. §1395ww(d)(5)(F).

6. As amended, the Medicare statute directs the Secretary to make an add-on payment for PPS hospitals which serve "a significantly disproportionate number of low-income patients." 42 U.S.C. §1395ww(d)(5)(F)(i)(I). Hospitals qualify under this standard if their "disproportionate patient percentage" exceeds certain thresholds, and the amount of the add-on disproportionate share payment for qualifying hospitals depends on the extent to which their disproportionate patient percentage exceeds the thresholds. 42 U.S.C. §1395ww(d)(5)(F)(v), (vii). The Medicare statute defines "disproportionate patient percentage" for a cost reporting period as "the sum of--

(I) the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title

XVI of this Act, and the denominator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this title, and

(II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period *which consist of patients who (for such days) were eligible for medical assistance* under a State plan approved under title XIX [Medicaid], but who were not entitled to benefits under part A of this title, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. §1395ww(d)(5)(F)(vi) (emphasis added). The second fraction, which has been referred to as the "Medicaid low income proxy," is the subject of the dispute in this case. The Medicaid fraction is just one factor used in determining Medicare reimbursement.

7. On May 6, 1986, the Secretary adopted regulations implementing the statutory disproportionate share add-on payment. *See* 51 Fed. Reg. 16,772,16,776-78, 16,788 (1986), codified at 42 C.F.R. §412.106 . The regulation sets forth the Secretary's interpretation of the Medicaid fraction. The Secretary interpreted the statutory language as follows:

Total Medicaid inpatient days will include all covered days attributable to Medicaid patients including any inpatient days for Medicaid patients who are members of a health maintenance organization. Section 1886(d)(5)(F)(vi)(II) of the Act describes Medicaid patient days as those "... which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX...." Therefore, Medicaid covered days will include only those days for which benefits are payable under title XIX. *Any day of a Medicaid patient's hospital stay that is not payable by the Medicaid program will not be counted as a Medicaid patient day since the patient is not considered eligible for Medicaid coverage on those days.* For example, if a patient is hospitalized for 15 days and is eligible for Medicaid benefits for 10 of those days, only the 10 covered days will be considered Medicaid patient days for purposes of determining a hospital's disproportionate patient percentage.

51 Fed. Reg. 16,777 (1986) (emphasis added). During the rulemaking process, commenters objected to the proposed rule, arguing that all inpatient days associated with a Medicaid recipient should be counted whether or not the patient was actually covered by Medicaid for those days. The commenters argued that, since a patient would still be "eligible" for Medicaid benefits even though part or all of the patient's care may not be covered by Medicaid for a certain day, all patient days for which care was actually provided to a Medicaid eligible individual should be counted. 51 Fed. Reg. 31,460 (1986). In response, the Secretary stated that:

We believe that the parenthetical phrase "for such days" in section 1886(d)(5)(F)(vi)(II) of the Act was intended to modify the phrase "eligible for medical assistance" and that Congress intended to include only such patient days for which the Medicaid patient was eligible to have his or her care paid for by the Medicaid program. We believe evidence of Congressional intent in this regard may be found in the legislative history of section 1886(d)(5)(F)(vi) of the Act.

The Conference Report described the House bill on section 9105 of Pub. L. 99-272 as defining low income patients as follows:

The proxy measure for low income would be the percentage of a hospital's total inpatient days attributable to medicaid patients (including medicaid-eligible medicare beneficiaries)--medicare/medicaid crossovers).

(See H.R. Rep. No. 99-453, 99th Cong., 1st Sess. 459 (1985)). The phrase "inpatient days attributable to medicaid patients" supports the commenters' interpretation that all days that are attributable to Medicaid patients (that is, for which the patient is Medicaid-eligible) must be included in the numerator of the definition. However, the House bill's definition was not ultimately accepted by the Conference Committee. The Conference Report states that:

The percentage of low income patients will be defined as the total number of inpatient days attributable to Federal Supplemental Security Income beneficiaries divided by the total number of medicare patient days, plus the number of *medicaid patient days* divided by total patient days.

(Emphasis added.)

(See H.R. Rep. No. 99-453, 99th Cong., 1st Sess. 461 (1985)). The substitution of the term "number of medicaid patient days" in the Conference agreement for the previous term "attributable to medicaid patients" suggests that Congress intended to adopt the definition as we currently understand it (that is, only hospital days covered by Medicaid should be included in the numerator). We believe that Congress consciously changed the focus of the Medicaid definition from the number of days that may be attributable to individuals eligible for Medicaid to the actual "number of Medicaid patient days" (that is, days that were paid for by the State's Medicaid program).

We believe this interpretation, that only Medicaid covered days should be counted, is not inconsistent with the statutory scheme as a whole, since the formula in section 1886(d)(5)(F)(vi) of the Act does not purport to identify all indigent patients. Rather, it refers to certain Medicare and Medicaid patients as an easily and objectively determined proxy for the indigent. Thus, under any reading of the statute, not all indigent patients are included in the formula. A Medicaid eligible recipient who has exhausted his or her benefits is thus situated similarly to the indigent patient who is not eligible for Medicaid at all, and so it is logical to treat them the same for purposes of determining the disproportionate patient percentage.

In addition, given the relatively short timeframe for implementing section 1886(d)(5)(F)(vi) of the Act, we believe it is reasonable to assume that Congress anticipated that the Medicare cost report would serve as the primary source for Medicaid patient day statistics. Our definition of Medicaid patient days is consistent with the way we require Medicaid days to be reported on the Medicare cost report. On that form, a day of care is designated a Medicaid patient day only if the Medicaid program is the primary payor. There is no provision on the form for a patient day being counted as more than one type for payment purposes. We do not believe that Congress intended that an additional reporting mechanism, possibly tied to State eligibility records, be developed to obtain Medicaid statistics on noncovered patient days.

Therefore, since Congress clearly intended that the disproportionate share adjustment be implemented promptly with the data currently available, we believe the definition of Medicaid patient days published in the interim final rule is the one that Congress intended that we adopt.

We should also point out that our interpretation that the Medicaid portion of the definition of the disproportionate share percentage under section 1886(d)(5)(F)(vi)(II) of the Act refers only to Medicaid covered days is consistent with our interpretation of the Medicare portion under section 1886(d)(5)(F)(vi)(I) of the Act (which uses similar language) to refer only to Medicare covered days.

51 Fed. Reg. 31,460-61 (1986). Because the Secretary interprets the Medicaid low income proxy as including only inpatient days actually paid for by state Medicaid plans, days that exceed the length-of-stay payment limits established by states, such as Missouri, that pay hospitals under Medicaid on a per diem basis, will not be counted as Medicaid days under 42 U.S.C. §1395ww(d)(5)(F)(vi)(II). 42 C.F.R. §412.106(b) . *See* 51 Fed. Reg. 31,460-61 (1986).

8. The Secretary's regulation, 42 U.S.C. §412.106(b), has been used since May 1986 to calculate Medicare reimbursement of hospitals that treat disproportionate numbers of low income patients. Although Congress has revised other aspects of Medicare reimbursement for low income patient hospital care, it has left the Secretary's interpretive regulation undisturbed.

9. States have considerable flexibility in establishing payment rates for hospital services under their Medicaid programs. 42 U.S.C. §1396a(a)(13)(A). Most states use a prospective payment system similar to Medicare's in that they pay a fixed amount for a particular DRG. Complaint at 5, ¶17; Answer at 4, ¶17. However, some states pay a per diem rate. *Id.* Some of these states pay the per diem rate irrespective of a patient's length of stay. *Id.* Others, however, establish limits on the number of days for which they will make payment. *Id.* In these states, hospitals receive as payment the lower of the aggregate limit or the per diem rate multiplied by the number of days in a patient's stay. *Id.* Thus, they do not receive any additional payment for a stay once the day payment limit has been reached. *Id.*

10. The State of Missouri pays hospitals for inpatient hospital services furnished under the Missouri Medicaid program on a per diem basis. 13 C.F.R. §70-15.010(1); Complaint at 5, ¶18; Answer at 4, ¶18. Certain hospitals (known as Tier 1 hospitals) are not subject to length-of-stay payment limits. 13 C.S.R. §70-15.010(6)(C)2.A.; Complaint at 5, ¶18; Answer at 4, ¶18. However, all other hospitals in the state are subject to specified length-of-stay payment limits. 13 C.S.R. §7015.030(1); Complaint at 5, ¶18; Answer at 4, ¶18. During its fiscal years ending September 30, 1988, and September 30, 1989 (fiscal years 1988 and 1989), plaintiff did not qualify as a Tier 1 hospital under the Missouri Medicaid program. Therefore, it was subject to the Missouri length-of-stay payment limitations for inpatient hospital services.

11. Part A Medicare providers, such as plaintiff, are paid by a fiscal intermediary (an insurance company under contract with the Secretary) designated by the provider and the Secretary. 42 U.S.C. §1395h; 42 C.F.R. §421.103 . At the close of a fiscal year, a provider of services submits a "cost report." 42 C.F.R. §§413.20(b) , 413.24(f) . The fiscal intermediary analyzes and audits the cost report and informs the provider of a final determination of Medicare reimbursement. 42 C.F.R. §405.1803 .

12. The fiscal intermediary issued Deaconess's Notice of Amount of Medicare Program Reimbursement ("NPR") pertaining to its cost reporting periods ending September 30, 1988, and September 30, 1989, respectively. (Tr. 39-41, 100-03.) During the hospital's two Medicare cost reporting periods ending September 30, 1988, and September 30, 1989, Deaconess rendered services to Medicare beneficiaries. In determining Deaconess's disproportionate share adjustment for those fiscal years, the hospital's fiscal intermediary included only those days for which payment was made under the Missouri Medicaid program (the state's length-of-stay Medicaid payment limits). It did not include all patient days in which care was provided to a Medicaid patient. The intermediary's exclusion of these Medicaid days reduced plaintiff's Medicare disproportionate patient percentage. The effect was to reduce plaintiff's Medicare payment by approximately $127,610 for fiscal year 1988 and approximately $144,825 for fiscal year 1989.

13. A provider dissatisfied with its intermediary's determination may file an appeal with an administrative body known as the Provider Reimbursement Review Board ("Board"). 42 U.S.C. §1395oo(a). If the Board determines that it lacks the authority to decide an issue raised by the provider, the provider may obtain immediate judicial review. 42 U.S.C. §1395oo(f)(1). Deaconess timely appealed the NPRs to the Provider Reimbursement Review Board (PRRB). (Tr. 35-38, 95-99.) It challenged the intermediary's calculation of the Medicaid fraction, contending that the Medicaid days excluded by its Medicare fiscal intermediary must be included as Medicaid days in computing its Medicare disproportionate patient percentage. The PRRB issued determinations that it lacked the authority to decide the issue raised by plaintiff. Administrative Record at 1-2, 72-73. Pursuant to 42 U.S.C. §1395oo(f)(1), Deaconess requested expedited judicial review of the intermediary's calculation of the disproportionate share patient percentage. The PRRB granted Deaconess's request on May 7, 1993. Complaint ¶25. Plaintiff thereupon filed the instant lawsuit.

*DISCUSSION*

At issue in this case is the Secretary's interpretative definition of the numerator of the Medicaid fraction, specifically the language that "patients who (for such days) were eligible for medical assistance under a state plan approved under (the Medicaid program)." 42 U.S.C. §1395ww(d)(5)(F)(vi)(II).

The underlying issue is whether the numerator should be calculated by counting all patient days attributable to Medicaid patients, whether or not paid for by state Medicaid plans (the construction urged by plaintiff) or whether the numerator should be calculated by counting only those days that are actually paid by state Medicaid plans (the construction chosen by the Secretary).

Plaintiff argues that the statutory mandate is clear and that the Secretary's interpretation is contrary to the plain meaning of the statute. In the alternative, the plaintiff argues that if the statute is ambiguous, then the Secretary's construction is unreasonable. In support of its position, plaintiff relies on *Jewish Hospital, Inc. v. Secretary of HHS*, 19 F.3d 270 (6th Cir. 1994), in which the Sixth Circuit rejected the Secretary's construction of this section of the statute as inconsistent with the plain meaning of the Medicare statute and unreasonable. The plaintiff also relies on *Legacy Emanual Hospital and Health Center v. Shalala*, 1995 WL 433608 (D. Or. April 20, 1995), which adopted the reasoning of the *Jewish Hospital* court on the same issue. There is no dispute that the issue before this Court is identical to the question of law ruled upon by those two courts.

The defendant argues that the statute does not express the unambiguous intent of Congress and that the Secretary's regulation is based upon a permissible construction of the statute. The defendant argues that plaintiff has failed to establish that the statute is unclear on its face or that the Secretary's interpretation is impermissible under the principles set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense*, 467 U.S. 837 (1984). To the extent that the panel majority in *Jewish Hospital* found to the contrary, the defendant argues that it is wrong and that the dissent was correct in finding that the statute is ambiguous and that the Secretary's interpretation is a permissible construction to which judicial deference is owed. The defendant further argues that the Secretary's construction gives full effect to all words in the statute and takes into account the limited data available to the Secretary when the adjustment became effective. The defendant also argues that the Secretary's interpretation has been in effect for eight years and the Congress, with full knowledge of that interpretation, has left it undisturbed. The defendant asks the Court to find that the Secretary's construction of the Medicaid fraction is clearly a permissible one which should be upheld.

*Chevron* establishes the standard that this court must use in reviewing an agency's construction of a statute that it administers:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effective to the unambiguously expressed intent of Congress. If, however, the court determines that Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute (footnotes omitted).

*Chevron*, 456 U.S. at 842-43. In examining Congress' intent, the court uses traditional tools of statutory construction. *Chevron*, 456 U.S. at 842-43 n.9. A statute must be construed " 'to give effect, if possible, to every word Congress used' " *Washington Hospital Center v. Bowen*, 795 F.2d 139, 145 (D.C. Cir. 1986) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

If the court determines that the statute is silent or ambiguous on the issue, the court looks at the agency's interpretation. *Chevron*, 467 U.S. at 842-43. In doing so, the court does not have to conclude that the agency construction was the only one permissible or that the agency construction was one the court would have reached. *Id.* at 843 n.11. It is properly the role of an agency to which Congress has delegated policy making responsibilities, and not the courts, to resolve ambiguous statutory issues "which congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with administration of the statute in light of everyday realities." *Chevron*, 467 U.S. at 865-66.

*The Language of the Statute*

Plaintiff argues that the Secretary's construction conflicts with the plain meaning of the Medicare statute in several ways: (1) It conflicts with the statute's focus on a patient's eligibility, rather than a state's payment to a hospital; (2) it construes the words "medical assistance" to mean "inpatient hospital services" when, in fact, "inpatient hospital services" is only one of twenty-five services encompassed within "medical assistance"; (3) it adopts a standard unrelated to whether patients are "low-income patients"; (4) it assumes that all states pay for services on the basis of days of care when, in fact, the majority do not; and (5) it effectively deletes key passages from the statutory language.

First, the plaintiff argues that the Secretary's construction conflicts with the statute's focus on a patient's eligibility, rather than a state's payment to a hospital. The statute refers to patient days "which consist of patients who (for such days) were *eligible* for medical assistance under a State plan approved under [Medicaid]" (emphasis added).

The Secretary argues that the plaintiff has written the words "for such days" out of the statute and that the phrase "for such days" means "state paid days" or the actual duration of the state rendered Medicaid benefits. The *Jewish Hospital* dissent found that the parenthetical "for such days" actually had meaning and was not superfluous and that

the phrase "means patient days *actually paid* by Medicare." *Jewish Hospital*, 19 F.3d at 279 (Batchelder, J., dissenting). Defendant argues that being "eligible" is just one part of the broader statutory formula used in the Medicaid fraction, and it cannot be construed in isolation from the rest of the statutory language. The Secretary notes that the words "for such days" appear in the parallel language of the Medicare fraction and that her interpretation harmonizes the use of the phrase "for such days" found in both the Medicare and Medicaid fractions and gives the same effect to that parenthetical language in the Medicaid fraction as it has been given in the Medicare fraction. Defendant points to Judge Batchelder's dissenting opinion, which was that the use of the terms "eligible" and "entitled" reflected the more general use of those terms in the Medicaid and Medicare legislation to describe the respective programs' potential beneficiaries. *Id.* at 278-79 (Batchelder, J., dissenting).

Eligibility standards for Medicaid are set forth at 42 U.S.C. §1396a(a)(10) and 42 C.F.R. Part 435. [1] While the states must follow the broad requirements imposed by the Medicaid statute and regulations, states also have flexibility in determining the rules of eligibility. However, an individual must be "needy" and have only very limited income and resources in order to be eligible for medical assistance. *See Wilder v. Virginia Hospital Ass.*, 496 U.S. 498, 502 (1990). The Missouri regulations establish a limit on a hospital's payment. *See* 13 C.S.R. 70-15.010(1), 70-15.030(1). It is undisputed that Missouri's regulations do not affect a patient's Medicaid eligibility and that a hospital is not free to discharge a Medicaid patient simply because the day limit has been reached. A hospital has an obligation under the Social Security Act to "assure" that Medicaid services will be provided economically and to the extent medically necessary and are of a quality which meets professionally recognized standards of health care." Failure to comply with these obligations subject a hospital to exclusion from the Medicaid program. 42 U.S.C. §1320c-5(b)(1); 42 C.F.R. §1001.701(a)(2) . The Missouri regulations provide that "[p]articipation in the program shall be limited to hospitals who accept as payment in full for covered services rendered to Medicaid recipients the amount paid in accordance with the regulations implementing the Hospital Reimbursement Program." 13 C.S.R. §70-15.010(10).

The *Jewish Hospital* majority found that the word "eligible" means "capable of receiving" federal medical assistance or Medicaid. The court found no indication from the statute that Congress intended to impute any special meaning to the word "eligible." The court also found that the phrase "the number of the hospital's patient days for such period" modified the term "eligible" and that this phrase speaks to the aggregate number of days for which a hospital provided Medicaid eligible services. Therefore, that court found that all days for which an individual was capable of receiving Medicaid should be figured into the proxy calculation and that a Medicaid eligible person was no less "eligible for medical assistance" on some days simply because his or her state Medicaid program only pays for a fixed number of days. *Jewish Hospital*, 19 F.3d at 274-75. The majority in *Jewish Hospital* treated the Medicaid and Medicare fractions as contrasting provisions because Congress used the word "eligible" in the Medicaid fraction and used the word "entitled" in the Medicare fraction. *Jewish Hospital*, 19 F.3d at 274-75.

Plaintiff argues that both the Medicare and the Medicaid fractions focus on the circumstances of the patient, not the hospital's entitlement to payment. The Medicare statute provides that an individual's "entitlement" to Medicare Part A "is established" by 42 U.S.C. §§426 and 426-1. 42 U.S.C. §1395c. Thus, the reference in the Medicare Low Income Proxy to "patients who (for such days) were entitled to benefits under part A of this title" is clearly to patients who "for such days" met the criteria of 42 U.S.C. §§426 and 426-1.

Defendant argues that the phrase "medical assistance under a State plan approved under [Title XIX]" has no broader meaning than to link the Medicaid fraction to the individual state plans, which as plaintiff concedes, vary in coverage. The plaintiff argues that some patients are "eligible for medical assistance" for only a portion of their hospital stay. The parties agree that the majority of states pay under Medicaid on a per stay or a per discharge basis. Therefore, plaintiff argues, it would make no sense to adopt "days paid" by Medicaid as the standard.

The wording of the Medicaid Low Income Proxy is not ambiguous. The statute directs the Secretary to count the number of patient days which consist of "patients who (for such days) were eligible for medical assistance under a State [Medicaid] plan[.]" 42 U.S.C. §1395ww(d)(5)(F)(vi)(II). The plain words of the statute indicate that the numerator is to consist of the patient days (without the limitation imported by the defendant) which are attributable to patients "eligible" for medical assistance under a state Medicaid plan. The Secretary's construction conflicts with the statute's focus on a patient's eligibility, by focusing on the state's actual payment to the hospital. The statute does not refer to patient days actually paid or actually reimbursed under Medicaid. The undersigned agrees with the reasoning of the *Jewish Hospital* majority. If a person generally is eligible for medical assistance under a state plan

approved by Medicaid while receiving Part A Medicare services, then all of the days during which such services were received during such eligibility should be included in the numerator of the Medicaid Low Income Proxy, whether or not the state Medicaid plan pays for all such days. Nothing in the statute permits the Secretary to disregard part of the patients' duration of the receipt of Medicare Part A services while otherwise Medicaid eligible and to substitute instead a hospital's limited Medicaid payment entitlement.

The undersigned notes that the statute does not specify "eligible for inpatient hospital services" but rather uses the words "eligible for medical assistance," which conveys a broader meaning. The Medicaid statute defines "medical assistance" as encompassing twenty-five items of care and service. 42 U.S.C. §1396d(a). "Inpatient hospital services" is only one of those twenty-five items. 42 U.S.C. §1396d(a)(1). Therefore, even if the Missouri Medicaid regulations rendered a Medicaid patient "ineligible" for inpatient hospital services for a particular day, they would not render the patient "ineligible" for "medical assistance" generally. The patient would still be eligible to receive other services for that day. 42 U.S.C. §1396d(a)(2)-(25).

This construction supports the statutorily-mandated purpose of the "disproportionate patient percentage," of which the "Medicaid Low Income Proxy" is a component. Congress sought to provide a supplemental PPS payment for PPS hospitals that serve "a significantly disproportionate number of low-income patients...." 42 U.S.C. §1395ww(d)(5)(F)(i)(I). The numerators of the two fractions establishing the "disproportionate patient percentage" identify "low-income patients." The numerator of the Medicaid Low Income Proxy consists of patient days attributable to patients "eligible for medical assistance" because a patient must be a "low-income patient" to be "eligible for medical assistance."

A literal construction of the Medicaid Low Income Proxy provision serves the statutorily-defined purpose. Whether a patient is "eligible for medical assistance" for particular days is directly relevant to whether the patient is a "low-income patient" for those days. On the other hand, the Secretary's construction defeats the statutorily-defined purpose. Whether a state's day payment limits preclude a hospital from receiving Medicaid reimbursement for furnishing care to a patient "eligible for medical assistance" for particular days has no bearing on whether the patient is a "low-income patient" for those days, the relevant consideration under the statute. *Jewish Hospital*, 19 F.3d at 275.

Because the undersigned concludes that Congress has spoken to the question at issue and that the intent of Congress is clear from the language of the statute, the Court need not address the plaintiff's additional arguments.

For these reasons, the plaintiff's motion for summary judgment is sustained and the defendant's motion for summary judgment is denied. An appropriate order is issued herewith.

*ORDER*

In accordance with the Memorandum filed herewith,

**IT IS HEREBY ORDERED** that the plaintiff's motion for summary judgment (Doc. No. 16) is sustained.

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment (Doc. No. 18) is denied.

**IT IS HEREBY DECLARED** that the defendant's construction limiting the numerator of the Medicaid Low Income Proxy (42 U.S.C. §1395ww(d)(5)(F)(vi)(II) to patient days paid under Medicaid is contrary to the plain wording of the statute.

**IT IS FURTHER DECLARED** that the numerator of the Medicaid Low Income Proxy includes all patient days attributable to patients eligible for medical assistance" for such days.

**IT IS THEREFORE ORDERED** that this action is remanded to the defendant for the prompt payment to the plaintiff of the amount in controversy, plus interest in accordance with 42 U.S.C. §1395oo(f)(2).

[1] A state must make medical assistance available to a group known as the "categorically needy." This group includes individuals who receive aid under title IV-A of the Social Security Act (Aid to Families with Dependent

21-A

Children ("AFDC")) or title XVI of the Social Security Act (SSI). In addition, states may (at their option) provide medical assistance to a group known as the "medically needy." This group consists of individuals who would be "categorically needy" except that their income exceeds the aid thresholds within specified limits. *See DeJesus v. Perales*, 770 F.2d 316, 318-319 (2d Cir. 1986), *cert. denied*, 478 U.S. 1007 (1986).

**ST. MARY'S HOSPITAL**
**Provider Number: 07-0016**
**DSH Calculation**
**Fiscal Year Ended: 09/30/1995**

**Impact of 569 additional Medicaid Secondary Payor Days**

| | | | |
|---|---|---|---|
| Increase in Medicaid Proxy | (1) | **569** | 0.96565067% |
| | | **58,924** | |
| DRG & Outlier | (2) | | $30,898,732 |
| Multiplier | (3) | | 65.00% |
| Net Impact | (1) x (2) x (3) | | $    193,943 |

**24**

**BEFORE THE**

**PROVIDER REIMBURSEMENT REVIEW BOARD**

In the Matter of:

**SAINT MARY'S HOSPITAL**

Fiscal Year Ended:
**September 30, 1995**

Provider No.:
**07-0016**

**PRRB Case No. 06-1828**

RECEIVED

DEC ... 2006

PROVIDER REIMBURSEMENT
REVIEW BOARD

**PROVIDER'S MOTION TO REINSTATE**

Mr. Dan DeBarba, C.F.O.
**Saint Mary's Hospital**
56 Franklin Street
Waterbury, CT  06706

Telephone: (860) 539-2472
Facsimile : (203) 709-3768

## I.    **INTRODUCTION**

Saint Mary's Hospital, a non-profit 220+ bed hospital located in Connecticut and owned by Saint Mary's Hospital ("Provider") hereby requests that the Provider Reimbursement Review Board ("PRRB" or "Board") reinstate the Provider's above-captioned individual Medicare appeal. By a letter dated October 19, 2006, the Board dismissed the Provider's appeal because the Provider failed to submit a preliminary position paper to Empire Medicare Services ("Intermediary"). Although the Provider missed this deadline by a few weeks, there has been no harm or disadvantage to the Intermediary, as the issues involved in this appeal all pertain to disproportionate share ("DSH") payments and are very familiar to the Intermediary. Further, the nature of the issues was made clear in the Provider's appeal letter.

## II.    **PROCEDURAL HISTORY**

For its fiscal year ended September 30, 1995 ("FYE 9/30/95"), the Intermediary issued a notice of amount of program reimbursement ("NPR") to the Provider on December 06, 2005. In response to the NPR, on June 02, 2006, the Provider timely submitted to the PRRB a detailed and specific appeal of various Intermediary adjustments.[1] The appeal issues all pertain to DSH payments and are not unique issues.

The Provider's appeal letter included a detailed list of the appeal issues, a list of the specific adjustments disputed, a sufficient factual background, the Provider's position on those issues, citations to regulations and manuals, and reimbursement impacts for each appeal issue. Furthermore, the Provider sent this detailed appeal letter to the Board and to the Intermediary.

On June 15, 2006, approximately 2 weeks after the Provider sent its appeal letter, the PRRB sent an acknowledgment letter with position paper deadlines. The PRRB set an October 1, 2006

---

[1] See Provider's Notice of Appeal, attached hereto as Exhibit A.

deadline for the Provider's preliminary position paper and a December 1, 2006 deadline for the Intermediary's preliminary position paper. The acknowledgement letter further indicated that the parties' final position papers would be due to the PRRB on or before February 1, 2007. Finally, the PRRB's acknowledgment letter established June 2007 as a "tentative month" for a live hearing of this matter.

Due to an unfortunate miscommunication between the Provider and its own reimbursement consultant that was assisting with the Provider's DSH issues, the Provider failed to provide a preliminary position paper to the Intermediary, and on October 19, 2006, approximately two and a half weeks after the Provider's preliminary position paper was due, the PRRB dismissed the Provider's appeal for such failure.

As discussed below, while the Provider will necessarily incur substantial harm should it lose the right to pursue its monetary claims pursuant to its FYE 9/30/95 cost report, no cognizable harm or prejudice will result to the PRRB or to the Intermediary from reinstatement of this matter.

## III.    BASES FOR REINSTATEMENT

### A.    The PRRB has the Explicit Authority to Reinstate the Provider's Appeal.

Pursuant to paragraph XIII(b) of the PRRB instructions, the PRRB has the explicit authority to reinstate an appeal dismissed by the Board, and specifically to reinstate an appeal for a Provider's failure to comply with PRRB procedures:

> The Board may consider provider requests to reinstate an appeal that has been dismissed…If you are requesting reinstatement because the Board dismissed your appeal for failure to comply with its procedures, you must explain in detail the reasons why you failed to comply. In general, this means the reasons you missed a position paper due date….Your request for reinstatement must specifically identify the issues you want reinstated, and you must provide the document or information that you did not submit timely, causing your appeal to be dismissed. The Board will then consider your reinstatement request.

Under the current arrangement between the Provider and its own independent reimbursement consultant, every dispute the Provider faces over Medicare reimbursement is sent by the Provider to its consultant for evaluation. Unfortunately, at some point during the pendency of this appeal, the Reimbursement position at the hospital fell vacant which resulted in a miscommunication between the Provider and its reimbursement consultant and the subsequent negligence over the timely submission of the preliminary position paper. This occurrence was purely accidental and by no means a result of bad faith or intention. Accordingly, the Provider has concurrently submitted a copy of the Provider's position paper with this Motion, and, pursuant to the above referenced instruction, the Provider respectfully requests that the Board exercise its authority to reinstate the issue stated in the Provider's Notice of Appeal: the Determination of Medicaid Percentage (Eligible Days).

**B.    The PRRB Should Exercise Its Authority to Reinstate This Case Because No Party Was Prejudiced by the Provider's Failure to Submit a Preliminary Position Paper and Any Technical Violation of the PRRB's Instructions is Rectified Herein, Well in Advance of the Final Position Paper Deadline and the Live Hearing.**

As with federal court procedural deadlines, mistakes, inadvertence, and negligence can and should be excused under certain circumstances. In particular, Federal Rule of Civil Procedure ("FRCP") 60(b), provides for forgiveness of procedural (as well as other) errors in certain circumstances:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect . . . or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more

28

than one year after the judgment, order, or proceeding was entered or taken.[2]

While the PRRB is not required to follow Eighth Circuit precedent, the Eighth Circuit, under whose jurisdiction the Provider falls, has recently considered nearly the identical issue as presented here.    In *Johnson v. Dayton Electric Manufacturing Company*,[3] due to an unfortunate miscommunication, a party failed to timely file an answer to plaintiff's complaint.  In response, plaintiff filed an entry of default which the district court upheld.

On appeal, the Eighth Circuit reiterated the United States Supreme Court's holding in *Pioneer Inv. Servs. v. Brunswick Assoc. Ltd. Partnership*,[4] that for purposes of FRCP 60(b), "excusable neglect" includes "late filings caused by inadvertence, mistake or carelessness."[5] Furthermore, the *Johnson* court restated that whether such conduct is "excusable" is an equitable determination that "tak[es] account of all relevant circumstances surrounding the party's omission."[6]

Using the four factor analysis enunciated in *Pioneer Inv. Servs.*, the *Johnson* court reiterated that in deciding whether to grant relief from a missed deadline as a result of "excusable neglect" under Rule 60(b)(1), four factors should be considered:

> (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith.[7]

---

[2] See Fed. R. Civ. Proc. 60(b); if a Rule 60(b) Motion filed a year after the judgment is considered within a reasonable time in the federal courts, then the Provider urges the PRRB to deem this Motion, filed _____ weeks after the date of the PRRB's dismissal, to be within a reasonable time.

[3] *Johnson v. Dayton Electric Manufacturing Company*, 140 F.3d 781 (8th Cir. 1998), attached hereto as Exhibit B.

[4] *Pioneer Inv. Servs. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380 (1993).

[5] *Johnson*, 140 F.3d at 784, citing to *Pioneer Inv. Servs.*, 507 U.S. at 388, 395.

[6] *Id.*

[7] *Id.*, at 784.

29

In light of these factors, the *Johnson* court held that under the present circumstances,

> …we have a good faith, relatively brief default in the filing of an initial pleading, caused by poor communication…and cured within one day once [the party in error] learned of its mistake. Without attempting to fix blame, the combined conduct of [the party in error] was careless, risking precisely the adverse result rendered by the district court. ***But it was not contumacious, it did not exhibit an intentional flouting or disregard of the court and its procedures, and it only briefly delayed the litigation. Thus, while we do not approve of this sort of cavalier approach to litigation, we conclude that [the party in error] was guilty of only a marginal failure for which relief from default should be granted if it has a meritorious defense and [the other party] will not suffer significant prejudice.*** (emphasis added).[8]

Accordingly, the Eighth Circuit reversed the holding of the lower court and remanded for further proceedings.[9]

As in *Johnson*, the present circumstances weigh heavily in favor of reinstatement. As the court in *Johnson* made clear, "prejudice may not be found from delay alone or from the fact that the defaulting party will be permitted to defend on the merits. Setting aside a default must prejudice plaintiff in a more concrete way, such as 'loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion.'"[10]

Similarly, no concrete prejudice will result here. Through the Provider's appeal, the Intermediary was on notice of the precise issues in dispute as well as the Provider's position with respect to those issues.[11] Furthermore, the Provider has filed its final position paper along with this

---

[8] *Id.*

[9] *Id.*

[10] *Id.*, at 785.

[11] Interestingly, a provider can add an issue to an appeal up until the commencement of the hearing date. 42 C.F.R. § 405.1841(a). Thus, the Medicare regulations certainly contemplate a PRRB hearing on issues (added at the last minute) without providing the intermediary the benefit of any position paper, let alone a preliminary and final position paper.

Motion, as required under the above referenced PRRB instruction, which is still two months before the parties' final position papers are due.[12]  The Intermediary therefore has ample time to prepare its own final position paper and will not be disadvantaged in any way by reinstatement.

As to the length of the delay and its potential impact on the proceedings, the Provider indeed notes that the position paper filed herein is eight weeks late.  However, such filing is still three months in advance of the final position paper deadline and over <u>seven months</u> in advance of the <u>tentative</u> month of hearing.[13]  Although the preliminary position paper is late, therefore, it is certainly not so late as to interfere with the final position paper deadlines nor the hearing date, which has not even been set.

Accordingly, the PRRB's proceedings in this case are not at all impacted by the minor delay in the Provider's submission of its position paper.  As stated above, there is more than sufficient time prior to the tentative hearing month of June, 2007 in which the Intermediary can draft and submit one or more position papers.

With respect to whether the Provider has acted in good faith, the Provider concedes that the fault for failing to send the Intermediary a preliminary position paper lies with the Provider.  There was somehow a miscommunication with the reimbursement consultant, and as a result, the Provider missed the pertinent deadline.  As in *Johnson*, however, the Provider's error was a result of carelessness, and at most, negligence.  It was not the result of devious or willful conduct, nor was it an attempt to circumvent relevant PRRB deadlines.  On the contrary, the Provider has acted in good

---

[12] The Provider recognizes that it is not normally required to file its preliminary position paper with the Board, but only to provide it to the Intermediary.  However, in compliance with PRRB Instruction XIII(b), the Provider has already filed it and the final position paper is included with this Motion.

[13] Given the overall typical length of the Medicare appeals process, a several week delay is quite minor indeed.  The hearing in this case will not likely occur for some time, since the PRRB intends to place the case in abeyance.

faith throughout the instant proceeding, and has articulated a supportable and genuine position in challenging the Intermediary's audit adjustments. The Provider timely filed its appeal and, from the inception of the appeal, has had every expectation that it would be able to pursue (or resolve) its disputes with the aid of the PRRB's process.

Based on the fact that there will be no delay in the present proceedings for all practical purposes, and based on the foregoing discussion of the Supreme Court's and the Eighth Circuit's forgiving position on granting relief for excusable neglect, the present circumstances present a compelling case for relief. Similar circumstances were enough for the Eighth Circuit to render a favorable ruling to the party in error, and the Provider respectfully requests that for the analogous reasons as those outlined in FRCP 60(b), the same is sufficient here.

Alternatively, to alleviate any minimal harm to the Intermediary, the PRRB could allow the Intermediary extra time to file its preliminary and final position papers,[14] and could penalize the Provider by only allowing it to submit the one position paper filed concurrently with this Motion.

**C.    The PRRB Should Reinstate this Matter in Order to Allow a Decision on the Merits**

Generally, federal courts have liberally construed procedural rules, such as the FRCP's, in favor of reaching the merits of a particular case. *See, e.g., Foman v. Davis,* 371 U.S. 178, 181 (1962) ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities."); *Klaudt v. United States Dep't of Interior,* 990 F.2d 409, 411 (8th Cir. 1993) ("The requirements of the rules of procedure should be liberally construed, and mere technicalities should not foreclose our consideration of a case on its merits."); *Western Sec. Co. v. Derwinski,* 937 F.2d 1276, 1281, 1282

---

[14] Indeed, there is ample time prior to the June, 2007 tentative hearing month in order to allow the Intermediary extra time to submit one or more position papers.

(7th Cir. 1991) ("Sanctions should be proportioned to the gravity of the misconduct . . . ." and "Case law is replete with instances in which the missing of deadlines, whether by government agencies subject to statutory deadlines or by private parties subject to deadlines set in contracts, does <u>not</u> lead to costly forfeitures."). Federal courts also must consider the "public policy favoring disposition of cases on their merits" before dismissing a case for failure to comply with a court order.[15]

     As in the federal courts, the PRRB should favor allowing parties to have their Medicare disputes decided on the merits. In this case, the Provider would face a very harsh forfeiture of its Medicare hearing rights (and possibly significant amounts of Medicare reimbursement) for failing to timely comply with a PRRB procedural rule concerning a preliminary position paper that was due many months prior to the tentative hearing date. Indeed, if the PRRB was not to reinstate this matter, then the punishment would not fairly match the crime. Accordingly, the Provider urges the PRRB to reinstate this appeal in accordance with the federal common law that encourages decisions on the merits.

### D.    <u>The Provider, For All Practical Purposes, Has Already Satisfied the Position Paper Requirement</u>

     Even in the absence of any prejudice to either party, the Provider has arguably already satisfied the requirements for a preliminary position paper by submitting a detailed and specific request for hearing. This document, which was sent to the PRRB and to the Intermediary, clearly and fully sets forth the issues in dispute and the Provider's position with respect to those issues. Indeed, in its letter of appeal, the Provider set forth a full explanation of the issues, the facts, all relevant citations, and the Provider's position. Further, the Intermediary is already very familiar

---

[15] *Sanders v. Union Pac. R.R.*, 154 F.3d 1037, 1040 (9th Cir. 1998).

with these issues, as they are not unique to this Provider and have been raised in appeals for earlier fiscal years by this Provider.

Similar circumstances were considered, and favorably determined, by the HCFA Administrator in its decision regarding a provider that had its individual appeal dismissed for failure to file a "list of issues."[2] In *UCSD Medical Center v. Blue Cross & Blue Shield Ass'n*,[16] the Board had refused to reinstate, and the HCFA Administrator remanded the case to the Board for a consideration of the argument (which the HCFA Administrator clearly supported), that the Provider had indeed satisfied the "list of issues" requirement by submitting a very detailed list of issues in dispute in its initial request for hearing.  On remand, the Board reopened the case and asked the Intermediary to inform the Board whether it agreed with the issues as set forth in the Provider's request for hearing.

As in the recent *UCSD Medical Center* HCFA Administrator decision, the Provider here has, for all practical purposes, satisfied the procedural requirements for a preliminary position paper even though the Provider did not submit a document expressly labeled  "preliminary position paper." From a practical perspective, the only recognizable difference between the two cases is that instead of a list of issues, this case involves the submission of a preliminary position paper.  Nonetheless, the very same arguments with respect to substantial or actual compliance apply.

---

[2] The PRRB procedural rules previously required the provider and intermediary to sign a joint list of issues prior to the start of briefing.  This requirement was eliminated when the PRRB revised its policies effective March 1, 2002.

[16] See *UCSD Medical Center v. Blue Cross & Blue Shield Ass'n*, HCFA Adm'r Dec. (Sept. 8, 1997), reprinted in [1997-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 45,725.

Along the same lines, the Board instructions provided on the Internet do not set forth any requirements for the format or content of a preliminary position paper.[17]  Rather, the PRRB instructions only require the parties to exchange preliminary position papers, and preliminary position papers are expressly not to be submitted to the PRRB (except for the first page).[18]  The PRRB instructions only set forth content requirements for *final* position papers.[19]  Thus, from a technical standpoint, any communication to the intermediary, in any form and with any content, should satisfy the requirement to send the intermediary a preliminary position paper.

With respect to the appeal issues, the Provider very clearly stated its positions in its June 02, 2006 letter of appeal: the Provider's letter clearly sets forth the Provider's name and number, fully describes the issues in dispute with specific references to audit adjustment numbers, and sets forth concise reimbursement impact computations for each issue appealed.  Thus, there can be no doubt that the Intermediary knew exactly what the issues were, what the Provider's arguments were, and what specific documentation and regulatory provisions were at issue.  Again, the PRRB does not require a provider to submit documentation or exhibits with a preliminary position paper.  Rather, the PRRB expects there to be an informal, unregulated, dialogue between the provider and its intermediary prior to the final position paper, and such conduct has occurred in this case.  Given that the Provider has filed a document that reasonably frames the issues of this appeal, the Provider therefore urges the PRRB to reinstate this matter.

E.    **The PRRB Does Not Have Statutory or Regulatory Authority to Dismiss an Appeal for Failure to File a Preliminary Position Paper.**

---

[17] See PRRB Instructions, Part II.B (the only requirements for the content or format of position papers is found under Part II.B.IV entitled "Acceptable Final Position Papers").

[18] See PRRB Instructions, Part II.B.I.

[19] See PRRB Instructions Part II.B.IV.

The Medicare Act grants a provider that is dissatisfied with an intermediary determination a hearing before the PRRB.[20]  Although Congress granted the PRRB the right to make rules and establish procedures, those rules and procedures cannot be inconsistent with the Medicare statutes or regulations.[21]  To dismiss an appeal for failure to send a preliminary position paper to an intermediary therefore violates a Provider's statutory right to a hearing.

Further, as noted above, the Medicare regulations do not even require a preliminary position paper.[22]  Indeed, the language of the regulation only notes that the record of a PRRB case will "ordinarily include a position paper from the provider . . . ."[23]  That language does not suggest, even implicitly, a hard and fast rule that a provider <u>must</u> file a position paper.  As with the statute, the regulations grant providers the right to a hearing if they are dissatisfied with an intermediary determination.[24]  Therefore, dismissal for failure to file a preliminary position paper violates the Medicare regulations that grant providers the right to a hearing.

Importantly, there is no regulatory authority to dismiss a case for failure to meet strict procedural deadlines (let alone for failing to file a document that is not even required under the regulations).  The Centers for Medicare and Medicaid Services ("CMS") certainly knows how to grant dismissal authority.[25]  Yet, CMS did not grant such dismissal authority to the PRRB for the circumstances presented herein.  Because the PRRB therefore lacks the authority to dismiss a

---

[20] See 42 U.S.C. § 1395oo(a).

[21] See 42 U.S.C. § 1395oo(e).

[22] See 42 C.F.R. § 405.1853.

[23] *Id.*

[24] See 42 C.F.R. § 405.1835.

[25] See, e.g., 42 C.F.R. §§ 489.68, 489.69, 489.70 (discussing dismissal of certain administrative appeals).

provider's statutory right to a hearing for failure to send a preliminary position paper to an intermediary, the Provider requests that the PRRB reinstate this case.

## IV.    CONCLUSION

For all the foregoing reasons, the Provider respectfully requests that the PRRB reinstate its FYE 9/30/95 appeal.   In light of the Provider's inadvertent mistake in failing to meet the Board's deadline for its preliminary position paper, a dismissal is a particularly harsh disposition and denies the Provider an opportunity to resolve disputed issues which necessarily involve hundreds of thousands of dollars. In light of the Eighth Circuit's recent decision in *Johnson* in which the court considered circumstances nearly identical (and perhaps even more egregious) than those present here, reinstatement is merited.   The fact that the Provider's position was set forth in detail and previously provided to the Intermediary in connection with the appeal provides further support for reinstatement, and given the HCFA Administrator's very closely related September 8, 1997 decision in connection with UCSD Medical Center, the most equitable and efficient course of action is for the Board to reinstate the Provider's appeal.   Finally, the PRRB should reinstate because the Medicare statutes and regulations do not grant the PRRB authority to dismiss an appeal for relatively minor procedural "noncompliance."

DATED: December _13_ , 2006

By: _Daniel J. Dikhler_

37

## __EXHIBIT__

Exhibit 1 :    Provider's Request for Medicare Appeal for FYE September 30, 1995 dated
June 02, 2006.







CERTIFIED MAIL
RETURN RECEIPT REQUESTED

June 02, 2006

Ms. Suzanne Cochran, Esq.
Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re:    **Provider Name**        :    **ST. MARY'S HOSPITAL**
      **Provider Number**     :    **07-0016**
      **Intermediary**          :    **Empire Medicare Services**
      **Request for Medicare Appeal**

## NOTICE OF CORRECTION – PROGRAM REIMBURSEMENT

<u>Notice Date</u>                    <u>Fiscal Year</u>

December 06, 2005                September 30, 1995

Dear Ms. Cochran:

The hospital respectfully appeals the under mentioned determinations of the Intermediary contained in the above NPR.

**Issue :**    **Disproportionate Share Payment**

    **Medicaid Percentage (Eligible Days)**

    The provider contends that the Fiscal Intermediary did not determine Medicare reimbursement for disproportionate share hospitals (DSH) in accordance with the statutory instructions at 42 U.S.C. 1395ww(d)(5) (c)(i). Specifically, the provider disagrees with the calculation of the second computation of the disproportionate share patient percentage, set forth at 42 CFR 412.106(b)(4) of the Secretary's regulations. The intermediary, contrary to the regulation, failed to include as Medicaid-Eligible Days services to patients for Medicaid, as well as patients eligible for general assistance.

Audited Adjustment #
Reimbursement Amount:        $193,900

Suzanne Cochran, Esq.
June 2, 2006
Page 2 of 2

The Provider will be personally represented at the requested hearing by its designated representative.

If you have any questions, please feel free to contact us.

Sincerely,


Suzanne Wojtowicz
Director of Reimbursement

cc:     Ms. Celeste Roberts, Manager, Audit & Reimbursement, Empire Medicare Services, P.O. Box
        4846, Syracuse, NY 13221-4846

        Mr. Wilson C. Leong, Director, Medicare Appeals, Blue Cross Blue Shield Association, 225 N.
        Michigan Avenue, Chicago, IL 60611

Enclosures



CENTERS for MEDICARE & MEDICAID SERVICES

**MEDICARE**
*Part A Intermediary*
*Telephone: 1-877-567-7205*

November 29, 2006

Mr. Steve Kirsh
Director
Division of Jurisdiction and Case Management
Department of Health and Human Services
Provider Reimbursement Review Board
2520 Lord Baltimore Drive Suite L
Baltimore, MD 21244-2670

RE:    Provider:            St. Mary's Hospital
       Provider #           07-0016
       Case #:              06-1828
       For Period Ending:   September 30, 1995

Dear Mr. Kirsh:

In accordance with the Boards instructions, please be advised that a copy of our preliminary position paper in the above captioned appeal has been sent to the Provider's representative identified below. Enclosed for your records is a copy of the first page of our preliminary position paper. The Blue Cross and Blue Shield Association (BCBSA), in Baltimore, will be submitting the final position paper.

The BCBSA will also submit five (5) additional copies when the hearing date approaches.

Sincerely,

*Anne Valerius*

Anne E. Valerius
Senior Auditor
Audit and Reimbursement Department

cc:    Mr. George E. Porette - Reimbursement Manager - EMS (with enclosure)
       Ms. Linda Uzzle – Senior Analyst - BCBSA (with enclosure)
       Mr. Robert Halko, Corp.Dir., Revenue Cycle & Fin. Plan. (with enclosure)

EMPIRE MEDICARE SERVICES
A Division of Empire HealthChoice Assurance, Inc., a CMS-Contracted Agent
2651 Strang Blvd. Yorktown Heights, NY 10598-2996
*www.empiremedicare.com*

MC4910 Rev. 10/20/2004
42

## BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD

| | | |
|---|---|---|
| Hartford Hospital | ) | |
| | ) | |
| | ) | |
| Provider No.  07-0016 | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| (Provider) | ) | PRRB Case No: 06-1828 |
| | ) | |
| v. | ) | FYE: September 30, 1995 |
| | ) | |
| Empire Medicare Services, a Member | ) | |
| of the Blue Cross and Blue Shield | ) | |
| Association, an Association of | ) | |
| Independent Blue Cross and Blue | ) | |
| Shield Plans/Blue Cross and Blue Shield | ) | |
| Association | ) | |
| | ) | |
| (Intermediary) | ) | |

## INTERMEDIARY'S POSITION PAPER

Submitted By:

George E. Porette
Reimbursement Coordinator
Anne Valerius
Senior Auditor
Empire Medicare Services
Audit and Reimbursement Department
2651 Strang Blvd.
Yorktown Heights, New York 10598

(914) 248-3202

November 29, 2006

MC5187 Rev. 12/16/2003



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671                    FAX: 410-786-5298

Suzanne Cochran, Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

<u>**CERTIFIED MAIL**</u>

OCT 19 2006

Saint Mary's Hospital
Robert M. Halko, Corporate Director
Revenue Cycle and Financial Planning
56 Franklin Street
Waterbury, CT 06706

RE: Saint Mary's Hospital, Provider No. 07-0016, FYE 9/30/2005, PRRB Case No. 06-1828

Dear Mr. Halko:

The Provider Reimbursement Review Board (the Board) advised you that this case would be dismissed in its Acknowledgment and Critical Due Dates letter if preliminary position papers were not submitted to the Intermediary by the first of October 2006. You were also advised to supply the Board with a letter certifying that the preliminary position paper due date had been met and a copy of the first page only of the preliminary position paper.

Pursuant to the Board's above cited letter and its Instructions effective March 1, 2002, "If you fail to meet the preliminary position paper due date and fail to supply the Board with the required documentation, the Board will dismiss your appeal for failure to follow Board procedure." Upon review of the above-referenced appeal, it was noted that the preliminary position paper was not submitted to the Intermediary and the required information was not submitted to the Board. Therefore, the Board hereby closes this case and removes it from the docket.

<u>Board Members:</u>
Suzanne Cochran
Gary B. Blodgett, DDS
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

For the Board:

*Yvette C. Hayes*

Board Member

cc:    Empire Medicare Services
       George Porette
       Reimbursement Coordinator
       2651 Strang Boulevard
       Yorktown Heights, NY 10598

       Wilson C. Leong
       BC & BS Association
       225 North Michigan Avenue
       Chicago, IL 60601-7680

Certified Article Number

7160 3901 9849 5951 9978

SENDERS RECORD

44



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671                    FAX: 410-786-5298

Suzanne Cochran, Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

**CERTIFIED MAIL**

JUN 1 5 2006

Saint Mary's Hospital
Robert M. Halko
Corporate Director
Revenue Cycle and Financial Planning
56 Franklin Street
Waterbury, CT 06706

RE: Acknowledgement and Critical Due Dates
    Case Number: 06-1828
    Date Filed: 6/2/2006
    Provider Name: Saint Mary's Hospital
    Provider Number: 07-0016
    Appealed Year – FYE: 9/30/2005

The Provider Reimbursement Review Board ("Board") has received your request for a hearing. You will need to obtain a copy of the Board's instructions which are located on the Board's web site at http://www.cms.hhs.gov/providers/prrb/prrb.asp. If internet access is not available to you, you may call the Board at (410) 786-2671 and request that a copy be mailed to you.

You must reference the case number and provider information on all correspondence with the Board. If any of the above information is incorrect, you must inform the Board, in writing, within 30 days of this letter.

<u>DUE DATES</u>

Certified Article Number
7160 3901 9849 5953 1727
SENDERS RECORD

**1ˢᵗ of October 2006**
Provider's Preliminary Position Papers due to Intermediary (with letter to the Board certifying that preliminary position paper due date has been met and copy of the first page only of the preliminary position paper).

**1ˢᵗ of December 2006**
Intermediary's Preliminary Position Papers due to Provider (with letter to the Board certifying that preliminary position paper due date has been met and copy of the first page only of the preliminary position paper).

**1ˢᵗ of February 2007**
Final position papers due to the Board from both Parties.

Page 2

## DISMISSALS

You are responsible for pursuing your appeal in accordance with the Board's procedures, which are outlined in the Board's Instructions. You must file your position papers, regardless of any outstanding jurisdictional challenges, motions or subpoena requests. If you miss any of your due dates including meeting either position paper due date, the Board will dismiss your appeal. The Board will not send a due date reminder. If the Intermediary fails to meet its deadlines, the Board will contact the Centers for Medicare and Medicaid Services (CMS) about contract compliance and will schedule a hearing date.

## TENTATIVE HEARING DATE

**June 2007:**  Tentative month and year of hearing.

The Board will send you a Notice of Board Hearing to notify you of the specific time, date and location of the hearing. The Notice of Hearing will be issued at least 30 days prior to the actual hearing date.

## OPTIONS

You may make a written request, at any time, that:
> Your month of hearing be rescheduled to an earlier month;
> Your case be heard based on the submitted record;
> Your case be conducted by video or teleconference;
> Your case be resolved through alternative dispute resolution/mediation;
> Your case be reviewed in a pre-hearing conference with a Board member.

If you request any of these options, you must continue to meet with the due dates set forth in this letter until you are advised regarding your request by the Board.

Steven R. Kirsh, Director
Division of Jurisdiction & Case Management

cc:   Empire Medicare Services
George Porette
Reimbursement Coordinator
2651 Strang Boulevard
Yorktown Heights, NY 10598

Wilson C. Leong
BC & BS Association
225 North Michigan Avenue
Chicago, IL  60601-7680

46

*JG - 1828*

*6/12/06*

**6/2/2006**

**Via FedEx**

June 2, 2006

Ms. Suzanne Cochran, Esq.
Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re:   **Provider Name**      :   **ST. MARY'S HOSPITAL**
      **Provider Number**    :   **07-0016**
      **Intermediary**       :   **Empire Medicare Services**
      **Request for Medicare Appeal**

**NOTICE OF CORRECTION – PROGRAM REIMBURSEMENT**

| Notice Date | Fiscal Year |
|:---:|:---:|
| December 6, 2005 | September 30, 1995 |

Dear Ms. Cochran:

The hospital respectfully appeals the under mentioned determinations of the Intermediary contained in the above NPR.

**Issue :   Disproportionate Share Payment**

**Medicaid Percentage (Eligible Days)**

The provider contends that the Fiscal Intermediary did not determine Medicare reimbursement for disproportionate share hospitals (DSH) in accordance with the statutory instructions at 42 U.S.C. 1395ww(d)(5) (c)(i).  Specifically, the provider disagrees with the calculation of the second computation of the disproportionate share patient percentage, set forth at 42 CFR 412.106(b)(4) of the Secretary's regulations.  The intermediary, contrary to the regulation, failed to include as Medicaid-Eligible Days services to patients for Medicaid, as well as patients eligible for general assistance.

Audited Adjustment #
Reimbursement Amount:        $193,900

The Provider will be personally represented at the requested hearing by its designated representative.

47

Suzanne Cochran, Esq.
June 2, 2006
Page 2 of 2

If you have any questions, please feel free to contact me at (203) 709-8795 or bob.halko@stmh.org.

Sincerely,

Robert M. Halko
Corporate Director
Revenue Cycle and Financial Planning

cc:     Ms. Celeste Roberts, Manager, Audit & Reimbursement, Empire Medicare Services, P.O. Box
        4846, Syracuse, NY  13221-4846

        Mr. Wilson C. Leong, Director, Medicare Appeals, Blue Cross Blue Shield Association, 225 N.
        Michigan Avenue, Chicago, IL  60611

Enclosures

48



**CENTERS for MEDICARE & MEDICAID SERVICES**

**MEDICARE**
*Part A Intermediary*
*Telephone: 1-888-855-4356*

Mr. David Cox
Chief Financial Officer
Saint Mary's Hospital
56 Franklin Street
Waterbury, Connecticut 06706

DEC 0 6 2005



Re: 07-0016

Dear Mr. Cox:

Enclosed please find notification of your REVISED final settlement for services rendered to Health Insurance Beneficiaries for the year September 30, 1995. This is being revised to include Medicaid eligible and unpaid days in the DSH calculation, per Attorney and CMS signed settlement agreement. The results of our reopening review have been incorporated in this REVISED Notice of Amount of Program Reimbursement (NPR). Based on this review, we find that Saint Mary's Hospital has been underpaid $240,290.00 for the fiscal year September 30, 1995, as summarized below.

| Provider # | Part A | Part B | Total |
|---|---|---|---|
| 070016 | $240,290.00 | $0.00 | $240,290.00 |
| **Provider Totals** | **$240,290.00** | **$0.00** | **$240,290.00** |

Therefore, we have calculated a payment due your institution in the amount of $240,290.00.

However, this amount will be offset due the amount due to the Medicare Program from your 09/30/2002 Final Settlement.

If you have any additional questions, please do not hesitate to call Melissa Vollmer at (315) 442-4540.

Sincerely,

Celeste Roberts, Manager
Audit & Reimbursement

Enclosures

EMPIRE MEDICARE SERVICES
A Division of Empire HealthChoice Assurance, Inc., a CMS-Contracted Agent
PO Box 4846, Syracuse, NY 13221-4846
www.empiremedicare.com
MC2199e Rev. 05/16/2005

49

Attachment A

## NOTIFICATION OF APPEAL PROCEDURES

There is a time limit of 180 days from the date of the notice of Program Reimbursement to file a request for either a BCBSA or PRRB hearing.  To be acceptable, a request for either type of hearing must:

(1) be in writing, (2) specify the individual adjustment items and amounts to which you take exception, (3) state the reasons supporting your position, and (4) cite the regulation and manual sections upon which you base your exceptions.  In addition, you may include any material you wish to have considered in support of your position.

Specific details concerning BCBSA hearings and Provider Reimbursement Review Board hearings follow:

## BCBSA HEARINGS

If your dispute relates to a period ending prior to June 10, 1973, or to periods ending June 30, 1973 and later, and the amount in controversy is at least $1,000.00, but less than $10,000.00, the Blue Cross Blue Shield Association Appeals mechanism will hear the dispute.

Request for BCBSA hearings should be sent to:

Medicare Provider Appeals Coordinator
Blue Cross Blue Shield Association
225 N. Michigan Avenue
Chicago, IL  60611-7680

In deciding whether or not to seek a BCBSA appeal hearing, you should know that the authority of BCBSA Hearing Officers is limited to a consideration of facts and the application of the law, regulations and general instructions as written in regard to those facts.  The officers cannot entertain arguments directed to the constitutionality, legality, propriety, or wisdom of any of the laws, regulations and general instructions.

You may discuss a disputed matter with us with a view towards resolution.  However, once you have filed a BCBSA appeal request, any settlement of the disputed adjustment(s) must be approved by a Blue Cross Blue Shield Association Hearing Officer.

(continued)

EMPIRE MEDICARE SERVICES
A Division of Empire HealthChoice Assurance, Inc., a CMS-Contracted Agent
PO Box 4846, Syracuse, NY 13221-4846
www.empiremedicare.com

MC2199e Rev. 05/16/2005    **50**

## PROVIDER REIMBURSEMENT REVIEW BOARD HEARINGS

If your dispute relates to a cost reporting period ending on or after June 10, 1973, and the amount in controversy is $10,000.00 or more, the dispute will be heard by the Provider Reimbursement Review Board established pursuant to Section 243 of PL 92-603. Appeal requests to the Provider Reimbursement Review Board should be addressed to:

Steve Kirsh – Director
Jurisdiction and Case Management Staff
Provider Reimbursement Review Board
Mail Stop C1-11-18
7500 Security Boulevard
Baltimore, MD 21244

Also, please send a copy of your appeal request to the following addresses:

| | | |
|---|---|---|
| PRRB Appeals Coordinator | | Ms. Linda Uzzle |
| Blue Cross Blue Shield Association | and | Program Manager |
| 225 N. Michigan Avenue | | Blue Cross Blue Shield Association |
| Chicago, IL  60611-7680 | | 7004 Security Blvd. |
| | | Suite 301 |
| | | Baltimore, Maryland 21244 |

Subsequent to the filing of an appeal request with the Board, discussions may still continue between us with a view toward clarifying, defining and narrowing the issues.

Please send a copy of appeal requests to:

Mr. George Porette, Manager
Empire Medicare Services
2651 Strang Boulevard
Yorktown Heights, New York 10598-2996

EMPIRE MEDICARE SERVICES
**A Division of Empire HealthChoice Assurance, Inc., a CMS-Contracted Agent**
PO Box 4846, Syracuse, NY 13221-4846
*www.empiremedicare.com*

MC2199e Rev. 05/16/2005

PROVIDER NO. 07-0016    ST MARY'S HOSPITAL
PERIOD FROM  10/01/94  TO  09/30/95

KPMG PEAT MARWICK COMPU-MAX MICRO SYSTEM    VERSION: 96.02
IN LIEU OF FORM HCFA-2552-92 (11/92)    10/25/05   9:22:44

ANALYSIS OF PAYMENTS TO PROVIDERS FOR SERVICES RENDERED    WORKSHEET E-1
HOSPITAL (07-0016)

| DESCRIPTION | | INPATIENT | | | | |
|---|---|---|---|---|---|---|
| | | PART A | | PART B | | |
| | | MO/DAY/YR | AMOUNT | MO/DAY/YR | AMOUNT | |
| | | 1 | 2 | 3 | 4 | |
| TOTAL INTERIM PAYMENTS PAID TO PROVIDER | | | 38059005 | | 4435055 | 1 |
| INTERIM PAYMENTS PAYABLE ON INDIVIDUAL | | | NONE | | NONE | 2 |
| BILLS, EITHER SUBMITTED OR TO BE SUB- | | | | | | |
| MITTED TO THE INTERMEDIARY FOR SERVICES | | | | | | |
| RENDERED IN THE COST REPORTING PERIOD. | | | | | | |
| IF NONE, WRITE "NONE",OR ENTER A ZERO. | | | | | | |
| LIST SEPARATELY EACH RETROACTIVE | | .01 | | | | 3.01 |
| LUMP SUM ADJUSTMENT AMOUNT BASED | PROGRAM | .02 | | | | 3.02 |
| ON SUBSEQUENT REVISION OF THE | TO | .03 | NONE | | NONE | 3.03 |
| INTERIM RATE FOR THE COST | PROVIDER | .04 | | | | 3.04 |
| REPORTING PERIOD. | | .05 | | | | 3.05 |
| ALSO SHOW DATE OF EACH PAYMENT. | | .50 | | | | 3.50 |
| IF NONE, WRITE "NONE", OR | PROVIDER | .51 | | | | 3.51 |
| ENTER A ZERO. | TO | .52 | NONE | | NONE | 3.52 |
| | PROGRAM | .53 | | | | 3.53 |
| | | .54 | | | | 3.54 |
| SUBTOTAL | | .99 | | | | 3.99 |
| TOTAL INTERIM PAYMENTS | | | 38059005 | | 4435055 | 4 |
| TO BE COMPLETED BY INTERMEDIARY | | | | | | |
| LIST SEPARATELY EACH | PROGRAM | .01 | 4/10/96 | 922520 | | 5.01 |
| TENTATIVE SETTLEMENT | TO | .02 | 5/13/97 | 887072 | | 5.02 |
| PAYMENT AFTER DESK REVIEW. | PROVIDER | .03 | 8/27/98 | 324829 | 9/26/01 | 83430 | 5.03 |
| ALSO SHOW DATE OF | | C1 | 9/26/01 | 104300 | | 5C1 |
| EACH PAYMENT. | PROVIDER | .50 | | | 4/10/96 | 608658 | 5.50 |
| IF NONE, WRITE "NONE", OR | TO | .51 | NONE | | 5/13/97 | 618933 | 5.51 |
| ENTER A ZERO. | PROGRAM | .52 | | | | 5.52 |
| SUBTOTAL | | .99 | | 2238721 | | -1144161 | 5.99 |
| DETERMINED NET SETTLE- | PROGRAM TO | | | | | |
| MENT AMOUNT (BALANCE | PROVIDER | .01 | | 240290 | | 6.01 |
| DUE) BASED | PROVIDER TO | .02 | | | | 6.02 |
| ON THE COST REPORT. | PROGRAM | | | | | |
| TOTAL MEDICARE PROGRAM LIABILITY | | | | 40538016 | | 3290894 | 7 |

| NAME OF INTERMEDIARY | INTERMEDIARY NUMBER | SIGNATURE OF AUTHORIZED PERSON | DATE (MO/DAY/YR) |
|---|---|---|---|
| MPIRE BLUE CROSS BLUE SHIELD | 00308 | | |

# EMPIRE BLUE CROSS AND BLUE SHIELD

## Summary of Medicare Final Reimbursement Settlement

Year:    __1995__    _Revised_

Provider:    __St. Mary's Hospital - Revised__    Provider #:    __07-0016__

__Amount Due to (Due From) Provider__

Part A    $ __240,290__

Part B    $ _____0_____

Other:    _____    $ _____

Net Amount due to (due from) Provider    $ __240,290__

__Date__

Prepared by:    __ANNE VALERIUS__    __10/25/05__

Checked by:    _Fred Rampersand_    _10/25/2005_

Reviewed by:    _____    _____

Approved by:    _CB_    _____

# Empire Medicare Services
400 South Salina Street, Syracuse, New York 13202

## 1995 DISPROPORTIONATE SHARE CALCULATION

HOSPITAL NAME : **St. Mary's Hospital**
LOCATION:        Urban
NO. OF BEDS:     224
TYPE:            Non-PIP

PROVIDER #: 07-0016                                    2

01/01/95 - 12/31/95

1. PERCENTAGE OF TOTAL MEDICARE PART A DAYS ATTRIBUTABLE TO
   MEDICARE PATIENTS WHO ARE ALSO SSI RECIPIENT (PERCENTAGE SUPPLIED BY HCFA)          5.04%

2. TOTAL MEDICAID PATIENT DAYS - TITLE XIX (WKST. S-3 PART 1 LINE 8, COLUMN 5)          9,329

3. TOTAL PATIENT DAYS (WKST. S-3 PART 1 LINE 8, COLUMN 6)                              58,924

4. PERCENTAGE OF TOTAL PATIENT DAYS ATTRIBUTABLE TO MEDICAID PATIENTS                  15.83%

5. DISPROPORTIONATE SHARE PERCENTAGE (A) (LINE 1 + LINE 4)                             20.87%

6. DISPROPORTIONATE SHARE PAYMENT ADJUSTMENT FACTOR  (B)                               6.43%

7. FEDERAL PORTION OF DRG PAYMENT (INCLUDING DAY AND COST OUTLIERS)                $30,898,732

8. DISPROPORTIONATE SHARE PAYMENT DUE PROVIDER (LINE 6 * LINE 7)    (WKST E PT A, LINE 4)      $1,988,214

54

```
PROVIDER NO. 07-0016   ST MARY'S HOSPITAL                KPMG PEAT MARWICK COMPU-MAX MICRO SYSTEM    VERSION: 96.02
PERIOD FROM 10/01/94 TO 09/30/95                         IN LIEU OF FORM HCFA-2552-92 (5/95)         10/25/05  9:22:44
```

CALCULATION OF REIMBURSEMENT SETTLEMENT                                                 WORKSHEET E
                                                                                       PART A

PART A - INPATIENT HOSPITAL SERVICES UNDER PPS

| | HOSPITAL<br>(07-0016) | SUB I | SUB II | SUB III | SUB IV | |
|---|---|---|---|---|---|---|
| DRG AMOUNT | | | | | | |
| 1 OTHER THAN OUTLIER PAYMENTS | 30656281 | | | | | 1 |
| 2 OUTLIER PAYMENTS | 242451 | | | | | 2 |
| 3 INDIRECT MEDICAL EDUCATION ADJUSTMENT | 5213974 | | | | | 3 |
| 4 DISPROPORTIONATE SHARE ADJUSTMENT | 1988214 | | | | | 4 |
| 5 ADDITIONAL PAYMENT FOR HIGH PERCENTAGE OF<br>ESRD BENEFICIARY DISCHARGES | | | | | | 5 |
| 6 SUBTOTAL | 38100920 | | | | | 6 |
| 7 HOSPITAL SPECIFIC PAYMENTS | | | | | | 7 |
| 8 TOTAL PAYMENT FOR INPATIENT OPERATING COSTS | 38100920 | | | | | 8 |
| 9 PAYMENT FOR INPATIENT PROGRAM CAPITAL | 3439637 | | | | | 9 |
| 10 EXCEPTION PAYMENT FOR INPATIENT PROGRAM CAPITAL | | | | | | 10 |
| 11 DIRECT GRADUATE MEDICAL EDUCATION PAYMENT | 1636859 | | | | | 11 |
| 12 NET ORGAN ACQUISITION COST | | | | | | 12 |
| 13 COST OF TEACHING PHYSICIANS | | | | | | 13 |
| 14 ROUTINE SERVICE PASS THROUGH COSTS | 271505 | | | | | 14 |
| 15 ANCILLARY SERVICE PASS THROUGH COSTS | 3438 | | | | | 15 |
| 16 TOTAL | 43452359 | | | | | 16 |
| 17 PRIMARY PAYOR PAYMENTS | 28751 | | | | | 17 |
| 18 TOTAL AMOUNT PAYABLE FOR PROGRAM BENEFICIARIES | 43423608 | | | | | 18 |
| 19 DEDUCTIBLES BILLED TO PROGRAM BENEFICIARIES | 2731720 | | | | | 19 |
| 20 COINSURANCE BILLED TO PROGRAM BENEFICIARIES | 153872 | | | | | 20 |
| 21 REIMBURSABLE BAD DEBTS | | | | | | 21 |
| 22 SUBTOTAL | 40538016 | | | | | 22 |
| 23 RECOVERY OF UNREIMBURSED COST UNDER THE LESSER<br>OF REASONABLE COSTS OR CUSTOMARY CHARGES | | | | | | 23 |
| 24 RECOVERY OF EXCESS DEPRECIATION RESULTING FROM<br>PROVIDER TERMINATION OR A DECREASE IN PROGRAM<br>UTILIZATION | | | | | | 24 |
| 25 OTHER ADJUSTMENTS | | | | | | 25 |
| 26 AMOUNTS APPLICABLE TO PRIOR COST REPORTING PERIODS<br>RESULTING FROM DISPOSITION OF DEPRECIABLE ASSETS | | | | | | 26 |
| 27 AMOUNT DUE PROVIDER | 40538016 | | | | | 27 |
| 28 SEQUESTRATION ADJUSTMENT | | | | | | 28 |
| 29 AMOUNT DUE AFTER SEQUESTRATION | 40538016 | | | | | 29 |
| 30 INTERIM PAYMENTS | 38059005 | | | | | 30 |
| 31 BALANCE DUE PROVIDER (PROGRAM) | 2479011 | | | | | 31 |
| 32 PROTESTED AMOUNTS (NONALLOWABLE COST REPORT<br>ITEMS) IN ACCORDANCE WITH HCFA PUB 15-II,<br>SECTION 115.2 | | | | | | 32 |
| 33 | | | | | | 33 |

55